IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CV-222-FL

| | | |
|---|---|---|
| RICHARD LEWIS KROBOTH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion for summary judgment (DE 46) pursuant to Federal Rule of Civil Procedure 56. The motion has been briefed fully, and the issues raised are ripe for ruling. For the reasons that follow, defendant's motion is granted.

**STATEMENT OF THE CASE**

Plaintiff commenced this action against defendant, plaintiff's former employer, May 31, 2019, asserting claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"). Plaintiff seeks declaratory judgment, reinstatement plus promotion, compensatory and punitive damages, and attorneys' fees.

After entry of the initial case management order, the court stayed the case pending resolution by the Equal Employment Opportunity Commission ("EEOC") of plaintiff's March 9, 2020, charge against defendant. Plaintiff thereafter was allowed to amend his complaint to include claims asserted in that charge, and the stay was lifted February 10, 2021.

Following a series of extensions modifying discovery and motions deadlines, defendant filed the instant motion for summary judgment February 18, 2022, with reliance upon: 1) testimony and declarations by Christopher Rimolt ("Rimolt"), plaintiff's supervisor during the relevant period; John LaPelusa ("LaPelusa"), plaintiff's former supervisor; Maurice Taylor, defendant's director of diversity recruiting; Holly Eble ("Eble"), with defendant's human resources; Valerie Vinson ("Vinson"), also with defendant's human resources; and plaintiff; 2) defendant's answer to the amended complaint; 3) excerpts from defendant's answers to plaintiff's first set of interrogatories, and 4) plaintiff's originally filed complaint.

In his defense of motion, plaintiff relies upon the foregoing testimony of record together with the following evidentiary materials: 1) emails, presentations, and other exhibits with reference to defendant's diversity initiatives; 2) contact reports by employee relations; 3) materials regarding plaintiff's performance and performance goals, including a letter from plaintiff to Rimolt following plaintiff's receipt of his "not meeting expectations" evaluation for the year 2018; 4) communications regarding the performance of other employees with defendant; 5) forms and other documentation of plaintiff's interviews with defendant, as well as plaintiff's preparatory materials for the interviews; 6) discovery requests and responses; and 7) defendant's response to the EEOC following plaintiff's filing of charges.

### STATEMENT OF FACTS

The undisputed facts, and facts viewed in the light most favorable to plaintiff, may be summarized as follows.[1] Defendant is a global pharmaceutical company with a goal of progressing towards an employee demographic that better aligns with the communities it serves, particularly

---

[1] Pursuant to Local Rule 56.1(a)(2), the court cites to paragraphs in the parties' statements of facts, or portions of such paragraphs, where not "specifically controverted by a correspondingly numbered paragraph in the opposing statement."

in management.  (Def. Stmt. (DE 48) ¶ 1, 5).  To that end, defendant employs a diversity and inclusion program, the purpose of which, at least in part, is to provide a broad range of candidates for every vacant position.  (Id. ¶ 5).  Defendant has been "very intentional" to "fill the gap" it has demographically, as previously the "talent" defendant recruited was not "representative of [] the customers [defendant] support[s]."  (Taylor Dep. (DE 49-4) 14:4-10; see id. 14:15-18 ("We still hire the most competitive person, but the activities I'm talking about is sourcing and getting more individuals interested in Lilly and engaging with them."); Rimolt Dep. (DE 49-2) 118:2-5 ("We always recruit for diverse candidate pools.  That's the—that's  the practice that we follow in order to make sure that the selection we ultimately make is the best selection.").  Defendant has, however, made the "conscious" decision not to "put a number on" or otherwise use "defined measures of diversity hiring," instead striving generally to improve diversity in terms of race, age, and sex.  (LaPelusa Dep. (DE 49-10) 77:1-18).

Defendant hired plaintiff, a white male born in 1972, as a sales representative in 2008. (Def. Stmt. (DE 48) ¶ 11).  In 2013, plaintiff was promoted to an area trainer, a developmental role for individuals interested in ascending into a management position, such as a district sales manager ("DSM") role.  (Id. ¶¶ 13, 19).  In July 2014, Rimolt, a white male born in 1968, became plaintiff's supervisor, and remained his supervisor until the end of plaintiff's employment.  (Id. ¶ 22). Plaintiff was the only area trainer Rimolt supervised.  (Id. ¶ 28).

Beginning in 2015, plaintiff expressed to Rimolt that "he did not think a white middle-aged man could survive" at defendant company because of its diversity and inclusion program.  (Id. ¶ 49; Pl. Aff. (DE 52-10) ¶ 21).  On December 17, 2015, plaintiff received a positive performance review for the year 2015, devoid of mention of performance issues or developmental gaps by

Rimolt and awarding plaintiff a 2.42% merit increase in pay and equity. (See generally 2015 Review (DE 1-5)).

In January 2016, plaintiff contacted human resources, reporting Rimolt told plaintiff he was going to "post" plaintiff's area trainer position as Rimolt wanted to "develop somebody new." (Pl. Dep. (DE 49-6) 157:14-23, 159:15-19, 164:10-25). Plaintiff also reported that he told Rimolt such action would be discriminatory. (Id. 161:11-13). The posting never was made. (Def. Stmt. (DE 48) ¶ 52).

In May of 2016, Rimolt contacted defendant's employee relations department to discuss his concern with the length of time plaintiff had been in the area trainer role. (Id. ¶ 23; ER Contact Report (DE 52-12)). Typically, employees serve in the area trainer role for two to three years, and by that point plaintiff had served in the role for approximately three years. (Def. Stmt. (DE 48) ¶ 19; LaPelusa Dep. 10:19-11:22). Rimolt explained that though he assessed plaintiff as meeting expectations as an area trainer, he did not see plaintiff being promoted to a DSM on Rimolt's team. (ER Contact Report (DE 52-12) at 3). Rimolt, however, was supportive of plaintiff returning to a sales representative role. (Id.). Employee relations relayed that though the area trainer role is meant to be developmental, if plaintiff was performing to expectations he would be permitted to remain in the position until such point as he vacated it. (Id.).

Plaintiff received a positive performance review from Rimolt in both the years 2016 and 2017. (See generally 2016 Review (DE 1-6); 2017 Review (DE 1-7)).

It is disputed when plaintiff's performance objectives for the year 2018 were discussed and finalized, but both sides agree as to their content. Plaintiff was to complete 12 coaching field rides per month and achieve a DSM role that same year. (Def. Stmt. (DE 48) ¶ 24). Area trainers primarily are responsible for the internal and ongoing training of defendant's sales representatives,

and field rides are one method of providing coaching. (Id. ¶¶ 14-15). As a point of reference, whereas plaintiff was to conduct 12 rides per month in 2018, DSMs are required only to complete nine. (Rimolt Decl. (DE 49-8) ¶ 13). DSMs additionally manage approximately ten to 14 sales representatives, however, whereas plaintiff in the role of area trainer did not have any direct reports. (Id.; Def. Stmt. (DE 48) ¶ 18). In early 2018 Rimolt met with Eble, a business partner with defendant's human resources, to review plaintiff's 2018 performance objectives. (Eble Decl. (DE 49-11) ¶¶ 1, 5, 6). Eble was "aligned with" the field ride objective. (Id. ¶ 6).

Plaintiff, however, believed the field ride objective to be unattainable. (Def. Stmt. (DE 48) ¶ 29). In March 2018, plaintiff contacted Vinson, an associate consultant with defendant's employee relations, complaining that his objectives set by Rimolt were unreasonable and set him up for failure. (Id. ¶ 31). Plaintiff additionally voiced concern that he had been passed over for multiple DSM positions for discriminatory reasons. (Id.).

Vinson reviewed the objectives and concluded plaintiff's objective of obtaining a DSM role that year needed to be reworded. (Vinson Dep. (DE 49-12) 13:6-21). Vinson, however, believed the objective of completing 12 rides was acceptable. (See id. 24:3-10). She also reviewed plaintiff's discrimination claims and concluded that they did not warrant further investigation. (Id. 14:1-15, 16:8-24:10, 51:9-10, 54:19-55:12, 56:13-21). As part of her review, Vinson contacted Rimolt about plaintiff's concerns, thus making Rimolt aware of plaintiff's complaints. (Id. 17:10-20).

Plaintiff continued to have conversations with Vinson concerning his field ride objective, contending the expectation was discriminatory and a product of defendant's diversity and inclusion initiatives. (Def. Stmt. (DE 48) ¶ 36). On October 10, 2018, plaintiff filed a charge of

5

discrimination with the EEOC alleging claims of race, gender, and age discrimination and retaliation. (Id. ¶ 53).

Plaintiff did not meet his 2018 objective of 12 field rides per month, self-reporting that he completed only an average of 4.7 field rides per month. (Id. ¶ 40). As plaintiff did not meet his field ride objective, Rimolt rated plaintiff as "not meeting expectations." (Id. ¶ 41). Plaintiff sent Rimolt a letter in response to his 2018 review, contending that Rimolt's evaluation was suspect and was motivated by his previous complaints of discrimination. (See generally Pl. Letter to Rimolt (DE 52-14)).

Rimolt maintained the same monthly field riding objective in 2019. (Def. Stmt. (DE 48) ¶ 44). From January to August 2019, plaintiff self-reported an average of 7.6 field rides per month. (Id. ¶ 46).[2] On July 15, 2019, Plaintiff filed a second EEOC charge of discrimination alleging claims of race, gender, and age discrimination. (Id. ¶ 54). As a result of missing the objective of 12 field rides per month, Rimolt rated plaintiff as "not meeting expectations" in his 2019 performance review. (Id. ¶ 54). Come March 9, 2020, plaintiff filed his third EEOC charge of discrimination alleging claims of race, gender, and age discrimination. (Id. ¶ 48).

During the years of 2018 and 2019, plaintiff applied for two DSM positions. The first was in May 2018, when plaintiff applied for an open DSM position in Charlotte, North Carolina. (Id. ¶ 76). Rimolt, the hiring manager and sole decision maker for the role, interviewed plaintiff. (Id.). Plaintiff was not selected, and Rimolt instead promoted Amy Corbin ("Corbin"), a white female born in 1977. (Id. ¶ 81). In May 2019, plaintiff applied for an open DSM position in Raleigh, North Carolina, for which Rimolt again was the hiring manager and sole decision maker. (Id. ¶ 82). Rimolt did not interview plaintiff for the Raleigh position, instead communicating that

---

[2]     September through October 2019 were not counted towards plaintiff s field ride metrics as plaintiff was on a leave of absence during that time. (Def. Stmt. (DE 48) ¶ 47).

plaintiff's failure to meet field ride expectations as an area trainer, also a primary responsibility of a DSM, made Rimolt believe plaintiff would not succeed in a DSM role. (Id. ¶ 82). Rimolt ultimately decided to reassign Corbin from the Charlotte DSM role to the DSM role in Raleigh. (Id. ¶ 86). Rimolt then reassigned Michelle Zoncick ("Zoncick"), a white female born in 1968, from a DSM role in Knoxville, Tennessee to Corbin's vacated DSM role in Charlotte. (Id. ¶ 86).

Plaintiff previously had applied for DSM positions between the years of 2014 and 2018, and most of those positions also were filled with Rimolt as the sole decision maker. (See, e.g., Kroboth Dep. 85:10-25-86:1-10; 111:5-14; 116:1-11; 138:9-15, 142:6-8). Plaintiff also had requested to apply to other DSM positions during that same time frame, but Rimolt denied his requests. (Pl. Aff. (DE 52-10) ¶ 5). On each occasion plaintiff was rejected for a promotion, or told he could not apply for a role, plaintiff complained to Rimolt that the decision was discriminatory and motivated by the diversity and inclusion program. (Id. ¶¶ 4-6).

On November 13, 2019, defendant restructured the area trainer role to a regional trainer role to facilitate a centralized, national training platform. (Def. Stmt. (DE 48) ¶ 91). The restructuring reduced the total headcount from ten area trainers to six regional trainers. (Id. ¶ 92). Four of the six new regional trainer geographies had two area trainers located within them, and plaintiff was in one such area. (Id. ¶¶ 93, 97). Defendant informed the area trainers, including plaintiff, that if two area trainers worked in the same regional trainer geography and neither found a new position by December 2, 2019, defendant would use its "HR Index," an algorithm that uses tenure and performance for the prior three years to score candidates, and the candidate with the highest score would remain an area trainer. (Id. ¶¶ 94, 96). The other candidate would be placed on "reallocation," which is a 12-week period where displaced workers search for other roles within the company while receiving full compensation and having no other job duties. (Id. ¶¶ 94-95).

7

Neither Plaintiff nor the other area trainer within the same regional geography, Dennis Green III ("Green"), a black male born in 1974, found new roles prior to December 2, 2019. (Id. ¶ 100). Plaintiff in fact did not apply for any open and available positions at defendant between the time that he was notified of the restructuring and December 2, 2019. (Id. ¶ 101). Defendant ran its HR Index to compare plaintiff's tenure and performance against Green's, and Green came out on top. (Id. ¶¶ 102-03). Plaintiff was notified of the outcome on December 4, 2019, and officially placed in reallocation January 7, 2020. (Id. ¶¶ 104, 107). Plaintiff did not apply for any positions with defendant during that interim period or during his time in reallocation, and his employment with defendant ended March 31, 2020. (Id. ¶¶ 106-09).

Additional details regarding the underlying facts relevant to the instant motion will be set forth in the analysis herein.

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party then must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.      Analysis

    1.      Failure to Promote in violation of Title VII

9

Title VII prohibits an employer from taking adverse employment action against an employee "because of" such individual's race or sex. 42 U.S.C. § 2000e-2(a)(1). Plaintiff contends he was denied two promotions because he is a white male: first, a DSM position in Charlotte, North Carolina in May of 2018 and second, a DSM position in Raleigh in May of 2019.[3]

When a plaintiff's Title VII claim is challenged on summary judgment, he may "avert summary judgment through [one of] two avenues of proof." Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). A plaintiff may present "direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as . . . [race or sex] motivated the employer's adverse employment decision." Id. Alternatively, a plaintiff may use the well-known McDonnell Douglas "burden-shifting" proof structure. Id.; see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Plaintiff's second avenue of proof, "[t]he McDonnell Douglas framework[,] is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination []; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016).

To establish a prima facie case of race and sex discrimination for failure to promote, plaintiff must show that: "(1) [he] is a member of a protected group, (2) there was a specific

---

[3]      Plaintiff includes mention in his charges of discrimination and amended complaint of additional instances where he allegedly was not promoted because of his race, sex, and age, but clarifies in his memorandum in opposition to the instant motion that those discrete incidents are noted only for the purpose of providing background information. As these alleged adverse actions took place before April 13, 2018, or 180 days before plaintiff filed his first EEOC charge on October 10, 2018, plaintiff is time-barred from promoting them as independent bases for relief. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002); 42 U.S.C. § 2000e–5(e)(1).

10

position for which [he] applied, (3) [he] was qualified for that position, and (4) [defendant] rejected [his] application under circumstances that give rise to an inference of discrimination." Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004).

In seeking summary judgment, defendant contends it is undisputed Rimolt, the sole decision maker for both the Charlotte and Raleigh position, did not believe plaintiff was qualified to be a DSM. The parties agree that "[t]he job responsibilities of a [DSM] include selecting, developing, retaining, and directly managing a team of approximately 10-14 Sales Representatives, fostering a positive culture within their team, ensuring strong sales results, adherence to [defendant's] policies, and coaching their team in a variety of ways, including by participating in an average of nine field rides per month." (Rimolt Decl. (DE 49-8) ¶ 13).

With respect to the Charlotte position, for which plaintiff applied in May of 2018, Rimolt was looking for a candidate who would improve the team's culture and drive sales as the district was, at that time, under-performing. (Id. ¶ 36).[4] Rimolt did not believe plaintiff in his interview sufficiently explained how he would improve the team's performance. (Id. ¶ 37). By comparison, Corbin, who Rimolt instead hired, communicated what Rimolt considered a compelling strategy to drive results in the Charlotte district. (Id. ¶ 38). It is undisputed that Corbin had been with defendant company roughly eight years longer than plaintiff, having been hired as a sales representative in 2000. (Id.). She also was a graduate of a Field-Based DSM Development Program, a highly competitive training program, and she had recent leadership experience through roles with development and leadership programs. (Id.).

---

[4]     Plaintiff in his response disputes this fact as Rimolt in his deposition testified that he could not recall the interviews he conducted for the Charlotte position. Construing plaintiff's objection as raising something akin to the sham affidavit rule, as Rimolt's declaration does not flatly contradict his deposition testimony, but rather is fairly understood as filling information gaps his earlier testimony acknowledged existed, it properly is considered at summary judgment. See Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984).

11

Plaintiff argues Rimolt fails to provide details of the compelling strategy Corbin outlined. Consideration of the actual strategy proposed by Corbin, however, is not required. The court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998). It is not the court's province to decide whether Corbin's strategy was in fact compelling, or to determine whether her strategy was a proper basis on which to make a hiring decision, so long as it truly was Rimolt's reason for hiring her. Id.

Plaintiff also challenges Rimolt's contention that plaintiff did not sufficiently explain how he would improve the team's performance, arguing he attended the interview with an assessment of the Charlotte team and a 45-day action plan for improving it. When analyzing an employee's qualifications for a particular job, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996). Accepting that plaintiff attended the interview with a better plan to improve performance, demonstrating that Rimolt's evaluation was thus in error, is alone insufficient to prove discrimination. See DeJarnette, 133 F.3d at 299 (an "employee's mere demonstration that his employer's belief may be incorrect is not sufficient to prove discrimination").

Turning, then, to the Raleigh DSM role, Rimolt elected not to promote any candidate, instead transferring Corbin from her role in Charlotte to Raleigh, and reassigning Zoncick, then a DSM in Knoxville, Tennessee, to Corbin's vacated role in Charlotte. (Def. Stmt. (DE 48) ¶ 88). Plaintiff does not dispute that in addition to having already served as a DSM, Zoncick had previously worked as an engineer at NASA, had a dual master's degree in business and electrical engineering, and had director-level experience prior to working for defendant. (Id. ¶ 63).

12

Given the relative qualifications and performance of the competing candidates, plaintiff requires additional evidence to carry his burden and show that he was qualified for a DSM position and rejected under suspect circumstances. Context from the record, however, does not support such inference. Relevant to Rimolt's hiring decision with respect to both the Raleigh and Charlotte position, there is no dispute that, while a DSM is expected to complete an average of nine field rides per month, plaintiff completed an average of 4.7 field rides from January to October 2018, with the breakdown as follows:

        a. January: zero;
        b. February: two;
        c. March: seven;
        d. April: three;
        e. May: ten;
        f. June: seven;
        g. July: five;
        h. August: three;
        i. September: two;
        j. October: eight.

During that time, plaintiff was expected to complete 12 rides. As plaintiff did not meet his field ride objective, Rimolt rated plaintiff as "not meeting expectations" in his 2018 performance review. In 2019, Rimolt maintained the same monthly field ride expectation. From January to August 2019, plaintiff self-reported an average of 7.6 field rides per month. As plaintiff had again missed the objective of 12 field rides per month, Rimolt rated plaintiff as "not meeting expectations" for a second time, in his 2019 performance review.

In sum, it is undisputed that beginning in 2018 and continuing through 2019, plaintiff failed to meet his performance objectives for his area trainer role, and also fell short of the nine field rides expected of a DSM. On this basis as well, defendant contends plaintiff was not qualified for the DSM role.

13

Plaintiff, however, argues that the performance objective of 12 field rides per month was itself discriminatory and unattainable. "[W]here application of the qualification or expectation element of the prima facie case seems to preclude an otherwise meritorious claim, the plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, 'legitimate.'" Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 517 (4th Cir. 2006). The plaintiff may "present evidence reasonably calling into question the honesty of his employer's belief" that he was not meeting expectations. DeJarnette, 133 F.3d at 299. For example, a plaintiff may show that an employer's evaluation "could be discredited . . . as inconsistent and contradictory." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 575 (4th Cir. 2015). Alternatively, a plaintiff might introduce evidence indicating the expectations were a "sham designed to hide the employer's discriminatory purpose." Warch, 435 F.3d at 518.

Rimolt offers two rationales for his expectation of 12 rides beginning in 2018. First, plaintiff was a seasoned area trainer, without direct reports and without the administrative responsibilities of a DSM, which plaintiff aspired to be, and in which role employees are expected to complete nine field rides. (Def. Answer to Pl. Interrog. (DE 49-4) Interrog. No. 14). Second, the needs of the business had evolved. Defendant launched two products, Trulicity and Jardiance, between 2014 and 2017 that formed the basis of defendant's diabetes' business unit and brought about changes in overall objectives. (Rimolt Dep. 157:11-25). Defendant also went through a re-organization, which altered Rimolt's geographic area of responsibility. (Rimolt Decl. ¶ 17). Effective as of January 1, 2018, Rimolt was responsible for managing six new DSMs, which resulted in an approximate 40% change in sales representatives requiring one-on-one training. (Id.).

Plaintiff challenges defendant's second explanation, contending there were not a significant number of new sales representatives who needed additional one-on-one training, and rather, while geographic lines changed, the number of sales representatives remained relatively constant. In support, however, plaintiff cites only to his own uncorroborated testimony. See Mackey v. Shalala, 360 F.3d 463, 469-70 (4th Cir. 2004) ("A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination."); see also BNT ad Agency, LLC v. City of Greensboro, 837 F. App'x 962, 968 (4th Cir. 2020) (holding that "self-serving" opinions without "objective corroboration" are not significantly probative).

Plaintiff additionally does not offer evidence reasonably calling into question Rimolt's first explanation that, as plaintiff was a seasoned area trainer with aspirations for promotion, Rimolt had higher expectations than he might for another, less-seasoned area trainer. That explanation also is supported by the testimony of Vinson, who reviewed plaintiff's 2018 objectives after plaintiff complained they were discriminatory. After her review, Vinson believed one 2018 objective needed to be reworded, that apparently requiring plaintiff to achieve a DSM role. She, however, testified she believed the objective of completing 12 rides was acceptable given plaintiffs years of experience. (See Vinson Dep. 24:3-10 ("I would say that [plaintiff] was a seasoned area trainer, and, you know, he had been in the role more than five years, and to have a higher level of expectation for someone with that level of experience is okay. It's okay to do."); see also Eble Dep. 13:3-23 (concluding the same)).

Further, regardless of whether the expectation of 12 rides was legitimate, the undisputed fact remains that plaintiff also fell short of the nine rides he would be required to complete as a DSM.

"It is axiomatic that an employer is free to set its own performance standards, provided such standards are not a mask for discrimination." See Beall v. Abbott Lab'ys, 130 F.3d 614, 619 (4th Cir. 1997), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). It is undisputed that plaintiff was not meeting defendant's field riding objective, and plaintiff has not brought forth sufficient evidence to create a genuine issue of material fact of whether that expectation was masking a discriminatory motive. Warch, 435 F.3d at 518. Plaintiff thus has failed to establish a prima facie case of race and sex discrimination for failure to promote.

Plaintiff does not rely solely upon the McDonnell Douglas burden-shifting framework, however, contending that defendant's diversity and inclusion initiatives serve as direct evidence of discrimination. See Diamond, 416 F.3d at 318. Plaintiff argues that defendant produced "numerous document that demonstrate a pattern favoring the promotion of females, and minority candidates." (Pl. Resp. (DE 52) at 4). Plaintiff, however, fails to cite with any specificity to the record for such contention, instead referencing exhibits 6, 20, 39-41, 44-49, 53-58, 61, and 71 in their totality. See Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys., 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material.").

Further, whether or not a defendant's diversity and inclusion initiatives constitute an unconstitutional race- and gender-based employment policy, practice and custom is only an issue if Rimolt's actions were taken pursuant to the plan. See Brown v. McLean, 159 F.3d 898, 904 (4th Cir. 1998); Cerrato v. San Francisco Community College Dist., 26 F.3d 968, 976 (9th Cir.1994) (stating that common sense dictates "that the mere fact of an affirmative action plan's existence is not relevant to proving discrimination unless the employer acted pursuant to the plan"). Here, as

aforementioned, the record indicates plaintiff was not promoted because he was not qualified for

the position sought. Beyond the general existence of diversity and inclusion initiatives, plaintiff

has not pointed to any evidence indicating that Rimolt's decision not to promote him was instead

pursuant to such initiative.[5] See Hawkins v. PepsiCo, Inc., 203 F.3d 274, 281 (4th Cir. 2000) ("[A]

plaintiff's own assertions of discrimination in and of themselves are insufficient to counter

substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.").

Thus, plaintiff's claim for discrimination on the basis of race and sex fails as a matter of

law.[6]

3.      Discrimination in Violation of the ADEA

The ADEA provides a cause of action against an employer for "discharg[ing] any

individual or otherwise discriminat[ing] against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a)(1). Under the ADEA, the plaintiff bears the burden of establishing that "age was the 'but-

for' cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177,

(2009). As under Title VII, evidence of causation may be direct or circumstantial under the

burden-shifting framework of McDonnell Douglas. Id. at 177-78. Pursuant to the foregoing

analysis, where the record reflects that plaintiff was not promoted because Rimolt did not believe

---

[5]      Indeed, as to plaintiff's claim for race discrimination pursuant to such diversity initiative, both the women who received the DSM roles sought also were white.

[6]      To the extent plaintiff also contends Rimolt issued plaintiff reviews of "not meeting expectations" in 2018 and 2019 because of his race, gender, or age, plaintiff's claim fails for largely the same reason. To establish a prima facie case of disparate treatment, plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) [an] adverse employment action; and (4) different treatment from similarly situated employees outside [of his] protected class." Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). Here, plaintiff has failed to establish satisfactory job performance. See Warch, 435 F.3d at 517-18 (plaintiff who was reprimanded based on concrete, specific observations failed to meet his legitimate job expectations).

17

him qualified to act as a DSM, plaintiff's claim from discrimination under the ADEA also fails. Particularly where both Corbin and Zoncick were, like plaintiff, over the age of 40 at the time of Rimolt's hiring decision, and Rimolt himself was over the age of 40.  See McNeal v. Montgomery Cnty., Md., 307 F. App'x 766, 775 (4th Cir. 2009) ("Courts have held that the fact that the relevant party is the same age or older than the plaintiff is circumstantial evidence against age discrimination.").

       2.       Retaliation in Violation of Title VII and the ADEA

"To establish a prima facie case of retaliation, [a plaintiff is] obliged to show that (1) he engaged in a protected activity; (2) [defendant] took an adverse employment action against him; and (3) a causal connection existed between the protected activity and the asserted adverse action." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 650 (4th Cir. 2002).  "The employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions."  Jacobs, 780 F.3d at 578.  "The burden then shifts back to the plaintiff to show that the proffered reason is pretext."  Id.

"[T]emporal proximity must be very close" in order to serve in itself as "sufficient evidence of causality to establish a prima facie case."  Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).  "A lapse of three to four months between the employer's knowledge of protected activity and the alleged retaliation is too long to establish a causal connection by tempor[al] proximity alone."  Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 127 (4th Cir. 2021).  In the absence of temporal proximity, plaintiff must produce some "relevant evidence" permitting a reasonable inference of a causal connection, id., such as by "look[ing] to the intervening period for other evidence of retaliatory animus," Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007).

Plaintiff fails to demonstrate a genuine issue of fact as to the third element of the prima facie case. Plaintiff began complaining of discrimination on the basis of race, sex, and age at least as early as 2015, when he told Rimolt that "he did not think a white middle-aged man could survive" at defendant company because of its diversity and inclusion program. (Pl. Aff. ¶ 21). He requested to apply for and did apply for a myriad of DSM positions beginning in 2014 and alleges that on each occasion Rimolt denied him such opportunity he claimed it was discriminatory and motivated by the diversity and inclusion program. In the years 2015, 2016, and 2017 Rimolt gave plaintiff positive performance reviews. It was not until December of 2017 or early 2018 that Rimolt took the alleged adverse action of setting a 12 monthly ride along objective. Temporal proximity alone thus does not establish a causal connection between plaintiff's complaints and the challenged objective, and plaintiff fails to produce any other relevant evidence permitting a reasonable inference of a causal connection.

In addition, and in the alternative, plaintiff has not demonstrated that the explanations provided for the riding objective, namely that plaintiff was a seasoned area trainer and the needs of the business had evolved, were a pretext for retaliation.

Plaintiff's claim for retaliation fails as a matter of law.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 46) is GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 29th day of March, 2023.

LOUISE W. FLANAGAN
United States District Judge

19